UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:23-cr-60  DRL  MGG |
| | ) | |
| KOBY ELDRIDGE | ) | |

**<u>UNITED STATES' SENTENCING MEMORANDUM</u>**

Comes now the United States of America, by its counsel, Clifford D. Johnson, United States Attorney for the Northern District of Indiana, through Joel Gabrielse, Assistant United States Attorney, and submits the following memorandum in preparation for the sentencing hearing in this case.

The government agrees with the information and many of the calculations set forth in the final presentence investigation report. The government recommends a sentence at the low end of the Guidelines range.

**Unresolved Guideline Issue:  U.S.S.G. § 3C1.2**

The PSR (D.E. 26) applies a 2-level enhancement for reckless endangerment during flight. The government and the defense oppose this enhancement.

On the night of May 17, 2023, a police officer recognized Mr. Eldridge's car and activated his emergency lights to initiate a traffic stop in Goshen. Mr.

Eldridge did not stop. Rather, he drove several miles until he reached his parents' home and pulled into the driveway. During the entire time, at least one police vehicle was directly behind Mr. Eldridge, with emergency lights and siren activated. Other police cars (using emergency lights) blocked off several cross-streets at intersections. The average speed of this pursuit was approximately 40 m.p.h., and at no point did it ever substantially exceed that speed. This speed did exceed several posted speed limits (usually 30 and 35 m.p.h.) but was generally within the range of typical driving speed for these roads.

While driving, Mr. Eldridge repeatedly used his turn signals and blinkers. His driving behavior showed a refusal to stop (until he got home) rather than a concentrated effort to shake loose from the pursuit and evade police entirely.

The pursuit lasted several minutes and several miles. No police officers attempted to "box in" Mr. Eldridge's car or to force it off the road. No stop sticks were used to target his tires.

Several times Mr. Eldridge did cross the center line, usually to avoid stopped traffic at red lights. Mr. Eldridge did disregard multiple red lights, although there was no cross-traffic at the time of these violations. A couple of other drivers did take actions to avoid him (and the tailing police cars), although those actions seemed to resemble controlled "pull over" actions

2

typically taken to clear the road for emergency vehicles. There were no collisions or injuries. There were other vehicles on the roads; there were no pedestrians. There did not appear to be any extremely close calls.

"To obtain the adjustment [under § 3C1.2] the government must show that the defendant did more than merely flee; the guideline requires 'additional conduct' that creates a substantial risk of serious injury." *United States v. Lard*, 327 F.3d 551, 553 (7th Cir. 2003).

In *United States v. Sanders,* 2019 WL 6487324, *5 (N.D. Ind. 2019), the Court considered a defendant who had used a vehicle to flee at 55 - 60 m.p.h. (or even 65 – 70 m.p.h.) in a 30 m.p.h. zone, at a time and location when pedestrians were often present, in a residential area with on-street parking that effectively reduced the travel to one-lane. The *Sanders* Court applied the 2-level enhancement but found even that situation to be a "close call." In the present case, none of Mr. Eldridge's behavior was as egregious as that. His flight undoubtedly raised the level of tension and thus overall danger. It is difficult to say, however, that he created any particular "substantial" risks of serious injury or death within the meaning of the guideline.

**Unresolved Guideline Issue:  Criminal History Points**

The PSR assigns 2 criminal history points for a marijuana case from Elkhart County. (PSR, ¶¶ 50-53) Mr. Eldridge was finally sentenced for that

3

case on February 13, 2013, making that date the material event for the "prior sentence" part of the analysis.

The closer question concerns the date of the "instant offense." Mr. Eldridge is being sentenced for unlawful possession of several firearms on May 17, 2023 as charged in Count 7. If that is the date of the "instant offense," the prior marijuana conviction is too old and does not receive any points.

Years earlier, on October 8, 2020, Mr. Eldridge illegally attempted to buy a handgun at a store. Months earlier, on September 9, 2022, Mr. Eldridge illegally attempted to buy a handgun at a store. On February 28, 2023, Mr. Eldridge again illegally attempted to buy a handgun at a store. If those actions constitute "relevant conduct" under § 1B1.3, they are considered part of the "instant offense" for purposes of § 4A1.2. (§ 4A1.2, Application Note 1) As such, those actions would bring the prior marijuana conviction within the 10-year timeline and the criminal history points would apply.

Offenses under 18 U.S.C. § 922(a)(6) (relating to false statements to acquire a firearm) and under § 922(g)(1) (relating to unlawful possession of firearms) are both considered under U.S.S.G. § 2K2.1. They are "grouped" for guideline purposes pursuant to § 3D1.2(d). As such, they are considered "relevant conduct" under § 1B1.3(A)(2) if they are part of "the same course of conduct or common scheme or plan." Courts consider a variety of factors such as "similarity, regularity, and temporal proximity" in making this

4

determination. *United States v. Acosta*, 85 F.3d 275, 281 (7th Cir. 1996). Unlawful possession of firearms on different occasions over a 6-to-9-month period has been found to qualify as "relevant conduct." *United States v. Santoro*, 159 F.3d 318, 321 (7th Cir. 1998). In the present case, Mr. Eldridge wrongfully attempted to obtain firearms on several occasions from October 2020 through February 2023. He then successfully obtained several firearms and wrongfully possessed them by May 2023.

Considering this analysis, it appears that the PSR is correct to assign 2 criminal history points to the prior marijuana conviction, and the government withdraws its objection.

With respect to some of the factors listed in 18 U.S.C. § 3553(a), the government now advises the Court as follows:

### Nature and Circumstances of the Offense

Mr. Eldridge had a longstanding fixation on handguns. After stealing a truck in October 2020, his first activity was to use the owner's stolen ID to try to obtain a handgun from a gun store. The transaction was denied. In September 2022 he tried again to obtain a handgun from a gun store. That transaction was also denied. In February 2023 he tried again to obtain a handgun from a gun store. That transaction was also denied.

5

Somehow his efforts were more successful, however, and he did obtain several firearms. On May 17, 2023, Mr. Eldridge went to a home in Elkhart, looking for an ex-girlfriend. When he was told that the young woman wasn't there, he pulled a handgun from his waistband and fired several bullets at a car parked in the home's driveway. That same evening, Mr. Eldridge went to another home in Elkhart to look for the woman and fired several more bullets at a car parked there.

When police located him in his car later that night, Mr. Eldridge refused to stop for them. When he was eventually arrested, police found 5 loaded guns in his car, along with a variety of loaded magazines and extra ammunition. Another loaded gun and more than 1,000 rounds of ammunition were found in his home, along with indications of methamphetamine use. He was also in possession of disturbing personal information about police officers, defense attorneys, and prosecutors.

### History and Characteristics of the Defendant

At age 18 Mr. Eldridge was involved with marijuana and alcohol in Elkhart County. He was given a chance to participate in a conditional discharge program to avoid a criminal conviction.

While on that program, however, Mr. Eldridge committed disorderly conduct in Monroe County and was arrested. Seven months later he was

caught in Elkhart County with marijuana and prescription medications that didn't belong to him. As a result, his conditional discharge in the original case was revoked and he earned a misdemeanor conviction and a few months in jail. When he was released, he was given numerous chances to avoid further jail time in the new case. Instead, he violated the terms of his work release program, repeatedly used a variety of drugs, and failed to consistently report as ordered.

Additionally, while those matters were pending Mr. Eldridge was caught driving while impaired and in possession of various drugs. He bonded out of custody but violated his treatment program by using drugs. He later violated a community corrections program in numerous ways before finally completing the program after approximately 2 ½ years.

On October 8, 2020—three days after being released from probation in the prior case—Mr. Eldridge stole a truck and fraudulently attempted to obtain a gun from a store as discussed above. In connection with this stolen-truck case, Mr. Eldridge was committed to Richmond State Hospital for several weeks for mental evaluation and treatment.

On September 9, 2022—seven months after the stolen-truck case was finally resolved—Mr. Eldridge again tried to unlawfully obtain a gun from a store as discussed above.

7

The facts of this case, and the information in the PSR, make it clear that mental health issues have posed challenges for Mr. Eldridge for many years. He has not always maintained compliance with treatment or medications, with predictable unfortunate results when he stops complying. Enforced compliance (for example, when required by courts or supervision programs) seems to have been the most effective for him.

Mr. Eldridge has also used various drugs for many years. Undoubtedly that use is both a means of coping with his mental health challenges and a contributor to those challenges.

Mr. Eldridge has some good family (parental) support, although it is somewhat unclear whether that support is consistently helpful (versus enabling). He has some work history and shows a willingness and ability to work, although his other challenges have interfered with building a strong employment history.

**Just Punishment, Adequate Deterrence, and Respect for the Law**

In general, similar sentences for similarly situated defendants provide just punishment and promote respect for the law. In general, the Guidelines provide the best hope for consistent sentencing. *United States v. Woods*, 2018 WL 10229903 (N.D. Ind. 2018). "[T]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar

8

offenses and offenders similarly." *United States v.* Bartlett, 567 F.3d 901, 908 (7th Cir. 2009). Indeed, the Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, although the Guidelines are advisory rather than mandatory, "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a) objectives." *Id*.

In this case, the application of the Guidelines does provide a solid starting point. The Guidelines account for the number and characteristics of the firearms that Mr. Eldridge possessed, and they address the fact that the firearms were connected to another felony offense when he shot at vehicles. How the Guidelines address Mr. Eldridge's criminal history is one of the matters for this Court to determine.

Whether the Guidelines also provide a solid ending point in this particular case is harder to answer. Although the Guidelines do not directly address them, Mr. Eldridge's mental health challenges and drug abuse loom large in this case. If unresolved, those issues may reduce his moral culpability while increasing his risk of recidivism and danger to the community. If / when those issues are resolved, Mr. Eldridge would appear to pose a much lower risk.

**Conclusion**

9

The government recommends a sentence at the low end of whatever Guideline range is deemed applicable by the Court.

Dated: May 8, 2024

                Respectfully submitted,

                CLIFFORD D. JOHNSON
                UNITED STATES ATTORNEY

By:   *s/ Joel Gabrielse*
       Joel Gabrielse
       Assistant United States Attorney
       United States Attorney's Office
       204 S. Main Street, Room M01
       South Bend, IN 46601
       Telephone: 574-236-8287
       Email: Joel.Gabrielse@usdoj.gov